We'll call the case of Harris v. KB&RS. Mr. Luciano. Good morning, Your Honors. May it please the court, my name is Joe Luciano, I'm counsel for Appellant Kellogg Brown&Root Services Inc., who I will refer to as KBR. I would like to reserve five minutes of my argument for rebuttal. Granted. And Mr. Luciano, the panel would ask that you first address the issue of appellate jurisdiction, which was raised by the clerk initially and which the parties have filed memoranda on. And specifically, I'd like to ask you how the prongs of Cohen can be met here, and let me start with the first prong of Cohen, which requires a fully consummated decision and a complete, formal, and final rejection of the defendant's motion. How do we have that here by the district court? Well, Your Honor, the prongs of Cohen have to be viewed in their entirety. Essentially, our argument for jurisdiction is that a substantial... What do you mean in their entirety? Isn't it true that all three prongs need to be met? Correct. Such that if you can't meet one of them, we don't have appellate jurisdiction. Correct. What I am saying is that the first prong has to be considered in light of the third prong. The third prong, basically our argument for jurisdiction in this case is that we have a substantial claim to immunity, meaning that we do not have to stand trial. Our client, under the doctrines that we have put forward before this court... How is this immunity? We believe that the combatant activities exception to the Federal Tort Claims Act grants us immunity from standing trial in this case. You're not being sued under the Federal Tort Claims Act. You're a private contractor. You're not the government. You'd like to be the government maybe, but you're working for the government, but you are not the government. As a matter of fact, I don't even see the government in court here. Their silence is deafening, isn't it? The government is not in court here. However, the decisions that have applied, the contractor, the combatant activities exception of the Federal Tort Claims Act to the private contractors like Salih and like Taylor have held that we have, as a private contractor, when we are acting in a wartime situation in a case that arises out of the combatant activities of the military, then we have immunity. Isn't this really a preemption question? It is a preemption question. Okay. And the district court analyzed at least the combatant immunity, the combatant activities section on a preemption basis, did they not? The court examined the combatant activities exception on a preemption, and also we argued to the district court that we had immunity as well. Okay. All right. But you argued that Exemption J under the Federal Tort Claims Act prevails here, and in effect, you're arguing that that federal law preempts the ability for the plaintiff to bring suit under state tort law, correct? Correct. Okay. So shouldn't we be looking to determine whether or not this case is properly before us at this time under the preemption doctrine? And how do you explain, how does this, you didn't cite it, you didn't bring it forward on a 28-J letter, but I'm interested in your comments on the case of Martin v. Halliburton, which was decided, I believe, by the Tenth Circuit. You need to be, you're familiar with that case. I'm not familiar with the facts of that case, Your Honor. You're not familiar with that case? No. I'm not familiar with the facts of that case. It's a military, it's a government contractor that argued the combatant activities exception, and Judge King held that the denial of government contractors' claim of official immunity was not immediately appealable under the collateral order doctrine. Sounds like your case was decided March 23, 2010. Your Honor, that case, we are arguing in this case, we believe it's supported by this court's decision in Carley, that the combatant activities exception does grant immunity to our client. And the immunity that's granted to our client is the immunity from standing trial, going through the discovery process, being forced to defend this case in the district court. I'm aware of no case which held that, first of all, you don't want to conflate the concept of preemption and immunity. They're two different concepts. You would agree with that, would you not? I would agree they're different, but they're related, Your Honor. Well, they're related, but they are two, the elements of each are different, are they not? The element... Just because you have a preemption question doesn't mean you also have an immunity question. I think, as I said, Your Honor, I believe they're related. I'm curious as to how they're related, though. Let's stay on that point. Because the preemption says that the state tort claims are not, you can't bring them against this client. We also believe that the extension of these cases by courts like the D.C. Circuit, who have extended Salih, says that these types of arguments give us immunity from suit, so that we do not have to be forced to defend ourselves on issues that relate to military decisions in a wartime context. Well, it's true that if the evidence before the district court were such that you could show without question on a summary judgment application that preemption here gives you the right not to go forward with the case, then you have every right in the world to say that if the court grants that order, that you're preempted from any liability because of the political question or whatever. But I'm aware of no case which says that merely because, as a contractor, you may have the right of preemption, that you automatically have immunity as well, and that you can sue to prevent being sued. Can you cite me such a case? Cases like Lane v. Halliburton have accepted arguments like the political question doctrine on interlocutory appeals, and other cases have done as well. I cannot cite you to a specific case that says what you have said, Your Honor. That is correct. That by reason of the concept of preemption, you are immune from suit. There's no such case. The Salih case, I believe, the Taylor case. The facts of that case are entirely different than this. I believe the facts in those cases are similar, if not identical, at least in the Taylor-type case, are similar, if not identical, to our case here. In those cases, I believe, give us the concept that we are immune from suit, such that we do not have to go through the discovery process like the federal government. Our argument on the combatant activities exception is that it is basically an indirect challenge to the federal government's sovereign immunity that has been extended to us, and it's very clear that when you have the federal government's sovereign immunity extended to you, your case extends the government's sovereign immunity to you. I believe the Salih case and the Taylor case and cases like that discuss the fact that No way do those cases stand for the proposition that as a private contractor, you have governmental immunity. I don't know how you read them. What I said, Your Honor, is that I believe that those cases stand for the proposition that when we fall within the parameters of the combatant activities exception, it is like, it is an indirect challenge to the federal government's sovereign immunity. Cases have extended that sovereign immunity to clients like ours who are private contractors in cases where the combatant activities exception applies because they recognize that there's an indirect challenge to the federal government's sovereign immunity because the decisions of the military are being questioned. Well, they extend it to you under the concept of preemption, that if you could prove combat activities or a political question, and there's enough evidence there that you are preempted from being sued, but they've never said that such a preemption is tantamount to immunity that you have the right to appeal simply because the district court would not recognize your claim to combat activities or a political question. There's no such case. I read these cases. If you can't get jurisdiction under the combatant immunities exception, how can you get it? Can you get it under the political question, Doctor? The political question is a lot closer question. I acknowledge that. You think it's closer? You think it's harder to get it? I think it's harder to get. I agree. I don't dispute that point. But under the Sallet case, under the Taylor case, the cases, the Cooey case, the Benslin case, we believe that those cases stand for the proposition that when you're attacking or suing a private contractor in the context of a combatant activities exception argument where the claims arise out of the combatant activities of the military, that's an indirect challenge to the federal government's sovereign immunity that we then get the benefit of under cases where, for example, Boyle and the Carley case where they have extended those arguments to private contractors. Isn't your case actually a lot closer to the Southern District of Texas case in Lessin versus your client and the Northern District of Georgia case also Carmichael versus your client or a predecessor to your client? The Carmichael case, I don't know if you're referring to the district court case, but the Carmichael 11th Circuit case has reversed that district court case essentially. And I believe our case is a lot closer to the case of Taylor and the Sallet case where we are arguing that the combatant activities exception applies to us and grants us an extension of the federal government's sovereign immunity such that we have a, when that is denied, we have, the district court has essentially forced us to go through trial. In Sallet, if you, you posited Sallet, so let's stop at Sallet a second. Isn't there a significant difference between the degree of military control over the activity of the interpreters in that case versus the degree of military operational control over your people in the maintenance of the buildings in Iraq? I don't believe that's the case, Your Honor. In the Sallet case, there was findings that for the interpreters that there was some control left with the contractor, that it wasn't complete control by the military. And the Sallet decision in the D.C. Circuit, in our view of that case, said that that control, it doesn't have to be complete control. And in our case, we believe that the control is very similar if not identical to what was found in Slay and also in Taylor. Our client was subjected to basically, we were told when we could go out to the buildings, we were told that we were limited to doing certain things. Isn't that a factual matter that's so inextricably tied into the merits that the second prong of the Cohen doctrine defeats your argument? No, I don't think so, Your Honor, because the second prong basically says that the, you have to be able to resolve an important issue separate from the merits of the appeal. If in fact, because what we're arguing is that the court in this case does not have, it's a jurisdictional threshold, jurisdictional argument. The court cannot go to the merits of the case because our arguments are that there's no jurisdiction to do so under the combatant activities exception and under the political question doctrine. Well, even if we were to accept your argument, you know, you're saying, sure, it's a combat zone. We all agree with that in that the military didn't want the total maintenance here. But no one told your contractor how to install the water pump. No one dictated to him how to put, as a matter of fact, didn't even tell him how to do it. And no one told him to ground it or not to ground it, if that's important. And the pump he put in, as I understand, was a substandard pump. It wasn't even a, it was a two-bit pump. It wasn't a good pump. So that your argument, even if we accept it, it has a lot of holes in it in that you claim that you're being supervised by the military to an extent which the combat activities here prevails. But even if we were to accept your claim on jurisdiction, there's a lot here that would indicate that you're a free agent, that you're doing a job and you did it negligently. Your Honor, we have a lot of disputes with the plaintiffs over the facts, but that's beside the point. What we were told was, you, KBR, you can go out to the building, you can replace what's there in kind. If you have an ungrounded pump, when you go out to that building, all you do is replace what's there. When we call you out, you fix just the specific problem. You don't do any upgrades, you don't do any preventive maintenance, you don't do any inspection. So we were under the control of the military. We did not have the option of going out and putting in a grounded pump when we were faced with a failure of an ungrounded pump. We were told, replace in like kind, replace exactly what's there, and don't do anything more. You didn't replace it in like kind. You replaced it with a substandard. The fact is, they claim, and there's a dispute here, as I understand from the record, it's not entirely clear to me, that you put in a two-bit pump, and I don't know what was there before, but their claim is that you put in an inferior pump. And they claim also that it should have been grounded such that it, whatever, this wouldn't have occurred. I understand what their claim is. As I said, we have a lot of disputes about that. Before KBR ever arrived at this facility, the military had refurbished that building and had installed whatever equipment they installed that was ungrounded. When we were tasked on, after the fact, three years after the fact, we came on the scene after people were already living in this building, we were tasked just to replace what was there. So when we were tasked, if in fact we were tasked to replace a water pump, and I don't think, as I agree with you, I don't think the record's clear on that, I think they've made some allegations of that, but those allegations are all beside the point because this, our arguments say we don't go to the merits, but all I'm saying to you- What was there? Was it already grounded? The pump? It was not. It was not the one that was there. They claim, I don't know what they claim, but it's not clear, but there seems to be a factual question here as to whether or not the pump that was there would have been, wouldn't have given this type of electrical shock. Your Honor, I think you could check the record. I don't think there's any evidence in the record that that pump that was there was grounded before we got there. We can do that. Mr. Luciano's reserved substantial time for rebuttal. We'll have you back. By the way, Mr. Luciano, that case I noted to you was from the Fifth Circuit, not the Tenth. I'm sorry, Your Honor. I am familiar with that case. I just didn't recall the facts of it. Kavanaugh. May it please the Court, my name is Patrick Kavanaugh, excuse me, here to represent the apologies today, Sherry Harris and Doug Maseth. If I can start out and address the jurisdictional questions that you raised with Mr. Luciano. First of all, on the jurisdiction, we agree and argue that, in fact, KBR does not meet the prongs as set forth in Cohen, which has been adopted by the Third Circuit, and specifically on two issues, that the order being appealed does not conclusively determine the disputed question. In fact, Judge Norah Berry Fisher's opinion specifically says that it was without prejudice for them to re-raise some of their arguments on summary judgment. The second prong of that argument is that it has to, the order being appealed has to resolve an important issue completely separate from the merits of the action. The combatant activities goes directly to the merits of the action, in the sense that they said, look, the work that we did that we're alleged to have performed negligently or been negligent because we didn't perform is a combatant activity. Mr. Cavanaugh, was the district court's decision on the combatant's activities exemption, was it couched in immunity or preemption doctrine? I believe it was couched in immunity, and I noted preemption. You argued, you allowed the defendant to argue immunity and you contested the immunity, but you didn't raise the preemption issue. We didn't because they've only raised combatant activities. We do not think that they are exempt for combatant activities for the purpose, for two reasons. Number one, on the combatant activities, the record is devoid of any evidence that, for two things, that Ryan Macy's, at the time that he was electrocuted, was engaged in combatant activities. Oh, that's a frivolous, I got to say, this is a combat zone. You can't say that he's not in a combat zone involved in combat activities. These guys get a shot tomorrow or today, border attacks, insurgency. I don't know about my colleagues, but that seems to be a frivolous argument that this is not a combat zone. Can I address that? Sure. One other way to look at that, and in fact, Cooey, I believe, gave a pronouncement on what the design of the combatant activities exception was. I think it's cited by Soleil. Not I think. It is cited by Soleil. They stated that it was designed to recognize that during wartime encounters, no duty of reasonable care is owed to those against whom force is directed. So they couched it in terms of a duty of care. In Cooey, a missile was shot and knocked down a passenger plane. Those passengers eventually became plaintiffs. In Fensland, a missile was fired and killed six Marines. Those six Marines and or their estates became the plaintiffs. In Soleil, they interrogated and abused, allegedly, prisoners at Abu Ghraib. Those prisoners eventually became plaintiffs because force was directed towards them. In this case, no force was directed towards Staff Sergeant Ryan Maseth. And so the design behind the combatant activities, even though they're in a combat zone, is not triggered here because it is not the case in this instance where KBR needed to be free to do whatever it needed to do in applying force. And so in the sense that when you say that they're in a combat zone, I realize it's a time of war and they're over on a base and things could happen. But the specific intent of the combatant activities has a different application. And that's even true in the cases that have been cited in this case. All right. If you are in agreement with the defendant that, at least as to the jurisdictional question, that this is immunity, an immunity question, you know, under our jurisprudence and jurisprudence in other circuits, haven't we said that immunity questions are interlocutory and can be appealed? You have said that. And my argument there would be recognizing that if you accept that immunity is one of the instances where the collateral order doctrine applies, and that's what they use in this case, I would argue then that you have to see whether there is immunity, whether in And here it would only be by way of combatant activities is demonstrated. I believe the court below gave KBR an opportunity to demonstrate whether they had immunity. She let both parties go take discovery on its defenses with respect to both political question and combatant activities. Discovery was had. It was submitted to the court. Limited discovery. Limited discovery. It was on just the defenses they raised. It was not wide open discovery. So discovery was raised or conducted on as limited issues, political question, combatant activities, and that's how we know, number one, with respect to Judge Cowen's concern that it's a combatant activity, we know that no force was directed towards Ryan Maseth that resulted in his death. But two, there was no other combat activity, and the court below decided that since there was no combat activity, there was no combatant activities exception. Well, you know, it's not exactly that simple because although Kellogg, you want to cast this as a product liability case, pure and simple, a tort action going on by reason of this activity that he didn't put the pump in right. But Kellogg's position is that it's not that simple. They will show that, number one, their claim is they're not negligent, but they're going to bring in the government and other claims concerning the combat activities as to why it was done the way it was, which will bring in that there were contributing causes to this accident. Even if they are negligent, they'll say, there are contributing and superseding causes, therefore, it's going to bring in questions of combat activities if not political question so that it's all intertwined and the preemption doctrine then prevails that this case is not a tort claim so quick. Sure. May I address a couple of points? Yeah. First of all- Specifically that it's just not their negligence, but the claims that they would make as to others negligence which contributed to this. Okay. First of all, I wasn't sure whether I heard you correctly, just so we're clear. We did not couch this, our claim, as a products liability claim. It is not a products liability claim, which is significant because there are other cases that assert the government contractor defense that would have other implications. It's just pure negligence. Pure negligence. Either wrongful death and survival. Correct. And then the second issue is one of the fundamental themes of a defendant's position, appellant's position, that their defenses would invoke the political question. Two issues there. Number one, the court below, Judge Norberry Fisher, did a fantastic job in analyzing the plaintiff's claims. She did analyze the plaintiff's claims, but through the lens, and only the lens, of what the defenses could be. Political question, I believe she hit all but the fifth prong of the Baker v. Carr requirements, which is, I just want to state that I don't believe anyone, the appellants and appellees don't disagree that those are the factors that apply here. But she analyzed that entirely within the context of their defense and what their defenses would be. And she also did the same with the combatant activities. But I want to address this because this may go to another case. I believe, and the case law does not speak specifically to this. But I believe at some point there is, I liken it to a Paul's graph analysis. Plaintiffs file a claim, defendants raise the political question. At some point, you can go so far down the line that you can invoke the political question at some point out here, and I think it is the court's job in the first instance to say, okay, let's see if those would be applicable at all in this case. And I think there has been a line drawn. Carmichael's, Carmichael's 2, Sallet, I can't think of the other one, but they draw the line and say, look, there's too much government control, for example, in a convoy case or when you're interrogating prisoners. In the McMahon case, the same 11th Circuit that decided Carmichael said in that case it was just incidental, even though they were in a plane transporting Marines over Afghanistan at a time of war, it was incidental. So there has to be, along the continuum, there's a decision that has to be made. And I would liken it to this. And by the way, although it was filed after we filed our briefs, the Solicitor General of the United States has taken a position in the Carmichael cert petition headed towards the Supreme Court. And they have actually stated, number one, that they believe Carmichael's was wrongly decided. Number two, and this is a quote out of their brief, and I thought it was significant enough to read. It says, the U.S. has, quote, significant interest in ensuring that its contractors exercise proper care in minimizing risks to service members and civilians and do not avoid appropriate sanctions for misconduct. They went on to say that they can think of a way to construct a trial, even in the Carmichael's convoy case, where the jury is required to consider whether the contractor acted reasonably, even given the circumstances which were then existing, which were a lot more hostile and were off of the military base compared to here. And I also thought of a hypothetical that might illustrate it. And it's this. If KBR and they are contracted or were contracted to serve at mess hall, meals at the mess hall, if they left the tuna salad out in the sun accidentally and the tuna salad became riddled with bacteria, they feed it to the soldiers, soldiers would get sick and one dies. Taken to the extreme, and I understand it's an extreme argument, taken to the extreme, they could raise the political question, I'm sorry, the combatant activities, because they said, well, look, we're in a combat zone. It wasn't our decision to serve tuna that day. It was the military's, the military told us what to order. It wasn't our decision to put the mess hall in a tent where there was no refrigeration and the like. And you can, then you get back into that continuum argument. And I'm not, you know, I use that as just an illustrative example. But the question is, I think it's the court jobs, and the court have in fact said, we're going to consider the plaintiff's claims and the political questions, and we're going to decide where that dividing line is. We just think here in this case that the dividing line, it falls on the side of the fact that there weren't political questions and weren't combatant activities. There was one other thing I wanted to address. The record, just so I'm clear, the complaint has said that KBR is negligent because they failed to diagnose the electrical current, failed to ground the water pump, failed to ground the building. There's a lot of dispute on what KBR says what it was allowed to do and not allowed to do. It is undisputed on this record that their own KBR chief of technical services said that if we could go into a building and we see that there's a problem, we had up to $2,500 without asking anyone else for authority to fix the problem. Because there was only limited discovery and we haven't gotten into full-blown discovery, we are going to deduce plenty of evidence that they could have fixed this problem for far, far, far, far less than $2,500, and probably $5. The other thing is we've alleged that they failed to diagnose what the real problem is. Sure, the pump might have been short-circuiting, but the pipes were energized, and an electrician should realize metal pipes in a building shouldn't become energized. That tells you you should go to the circuit breaker, which everyone in this case admits was ungrounded, and fix the circuit breaker. They went out there repeatedly with the pipes energized. That's not even in dispute. And we've maintained not only did you not ground the water pump, you completely misdiagnosed the problem, and that is not something the military controlled. In fact, numerous depositions, the two depositions of the mayors, Skaggs and Kerry in this case, were taken. They said, we handed the office service order to them, once someone put one in, we didn't go with them. It was their job to diagnose it. But don't go through the point that this is a military decision here, that implicating their defenses, which are going to bring in other contributing causes, namely they were called to replace a pump, they replaced the pump. Sure, they could have done other things, but they didn't have to, it wasn't required. And that there are several defenses implicating military decisions, especially at the very least to which would be contributing causes to this. And so we get involved as to what a contractor should do on the battlefield. And this is a battlefield. We would accept that, look, they're placed here. They weren't called, the service order didn't come in, go replace the water pump. It said, someone's getting shocked at the sink, go figure out what's wrong. They made the determination, we've got to fix the water pump. The Army had absolutely no role in that at all. They were given, here's their job, they were given a contract, they accepted it, they got paid plenty of money to do their job. Now the question is, did you go out and diagnose the problem, do the job? You're getting into a contract interpretation. Their position is not that they were told to go in there and do whatever is necessary to cure the problem. They were given a, their interpretation of the contract is entirely different than yours. You acknowledge that? No, not really. Just when you get down to the contract. Isn't that a question of fact, that it's going to bring in military on one side and you on the other, or the contractor on the other side? They don't dispute that once they got the service order, they had the obligation to fix it. That was their contract. We just said, under the contract, when you went there, you failed to diagnose it, you  What does fix it mean? They got to rewire the whole building and fix the whole thing right from square one. That's a question of fact, but that's a substantive defense. They can say, look, we weren't authorized to rewire the whole building. We would maintain, and we know we're going to, if the case proceeds, we will adduce evidence that that's not the case at all. But those are substantive, detailed facts that are without regard to political questions. Mr. Cavanaugh, how do you distinguish this case from Soleil? Soleil? Soleil, the feature in Soleil is that, effectively, the contractors were acting as interrogators and interpreters. And I believe the court uses language similar to, they essentially were all, they were soldiers all but in name. And the combat, I also believe that in Soleil, the plaintiffs conceded that picking up combatant combatants off the battlefield, taking them into Abu Ghraib and interrogating them was a combatant activity. I believe the spin on the argument in Abu Ghraib, which is wholly different from this case, is the fact that they said, yeah, it was combatant activities, but because the Army has come down on the contractors as showing that even that the actions of the soldiers was bad, that they should also come down on the contractors. But they were, just from a factual basis, and Baker Carr says that for political questions, you need to engage in discriminating review of the facts of the case, and Soleil involved combatant activities engaged in what we would concede combatant activities in interrogating soldiers at the Abu Ghraib prison. That wholly, we believe, is a far cry from a KBR electrician on a base walking in trying to solve electrical current in someone's bathroom. So we would distinguish it both on the opinion itself, the facts of the case as well. Why shouldn't we follow the reasoning of the court in Carmichael? Why should you not? Why shouldn't we, the reasoning, an example, the 11th Circuit in Carmichael, didn't Carmichael appropriately distinguish a prior case law in McMahon and Lane? Well, McMahon, they let go forward, and... But what's wrong with Carmichael in the 11th Circuit? Didn't they have it right? I think they got a lot closer in that in McMahon, it was incidentally, in Carmichael, yeah, I think it's a lot closer call, and certainly a way closer call than the current case, because in Carmichael, they left the base transferring fuel to an Air Force base across a known hostile area. The convoy was warned of hostile activities before, in fact, it got attacked by an IED in that convoy. The military said, you must space your trucks 100 yards apart. You must go between 50 and 60 miles per hour. You have to obey the orders of the Army while you're doing it. In that case, I think it is the case that they found that they were under plenary control of the Army and didn't have, in this case, the driver of the convoy truck that overturned, he didn't have the choice but to take the S-curves at 50 to 60 miles per hour. Well, here, they were told to replace the pump. They replaced the pump. No, in fact, they were not told to replace the pump. They said, someone's getting shocked in the shower. Here's a service order. Could you please go figure out what was wrong? After that, after they handed off the service order, an Army official didn't go with them. An Army official didn't approve their work. They didn't inspect the work. They didn't supervise the work. They said, we've got a problem here. You're the electrical contractor on this base. Go figure out what it is. Tell me when you're done. That is far different than the convoy where they're telling, this is what you have to do. I can't emphasize enough that, in fact, they were not told. A soldier did not hand in a service order request saying, hey, the pump is shorting. They're just saying, a soldier, the same soldier who had Ryan Mace's bathroom six or seven times was getting shocked in the very shower that Ryan Mace, seven months later, was electrocuted and died in. Put in a service order request, and all he said was, I'm getting shocked in the shower. He didn't know where it was coming from. We rely on KBR to go and figure out what the problem is. They were not told what to do, what to fix. And more importantly, they didn't go back to KBR, and this is sworn deposition testimony in this case. They didn't go back to KBR and said, hey, we diagnosed the problem. We need to rewire the building. Sergeant Skaggs said they never made the request. David Carrier, the other mayor, never made the request. So it is far different than the, quote, plenary control, end quote, that you see in Carmichael's. And I think Carmichael's is a closer question. And I think some of these cases are decided correctly on the political question side. I just don't think our case is one of those. Thank you very much. Sure. Kevin, I'm Mr. Messiano, Mr. Butler. Your Honor, I just want to apologize for drawing a blank on Martin. We did address it in our brief on page three in footnote one and distinguished it on the fact that the, in that case, there had been absolutely no discovery. In this case, we've had seven months of extensive discovery. And the other way we distinguished that case was the fact that it was treated by the court there as a garden variety preemption case. Which brings me to the next point, and that is that in this court's decision in Carley, the court indicated that the extension of the government immunity is an issue of immunity. It says, this is on page 1123 of Carley, it says, the court notes that after observing the defense originated cases immunizing private contractors from liability out of public works projects, the court concluded that the rationale of the defense is the extension of sovereign immunity. And then in circumstances where the government would not be liable, private actors pursuant to government directives should not be liable either. It goes on in the next page, I think it's the same actual page, it says, notes that the actions is not limited to military procurement, that the issue of sovereign immunity extension to private contractors is valid after Boyle. Yeah, but no one told Kellogg in this case how to put in the pump. There's no direction here by the military or anyone else. They're doing a job and installing it, yeah, it's not apropos the analogy. Your Honor, I would say with the pump, we have a large dispute as to what happened with that pump. It really is irrelevant to our arguments on the PQD and the combatant activities exception. The point is, is that what we were told is you have an ungrounded pump, replace it with an ungrounded pump. That was what our contract required us to do. That is what we did. Well, see, the problem is you disagree with them and they disagree with you as to what the contract required you to do. The judge, the district judge filed in this case, if you look at what the district court's findings were, they basically, the district judge found that we were required to replace in like kind what was there. There are military declarations that are uncontradicted that said level B is purely reactive maintenance. You go out and replace what's there based upon the existing infrastructure. That's it. Case closed, end of story. Put the pump in. If it's ungrounded when you go there, you replace it with an ungrounded pump and you leave. You're not allowed to upgrade the building. The rest of the issues that Mr. Kavanaugh raises all go to the merits. Our arguments precede that. We say you can't go to the merits in this case. You can even assume there's negligence, but under the combatant activities exception, the PQD doctrine, the court does not have the power and we have the immunity from those types of arguments. Well, you're saying immunity. You're saying really you have preemption from this argument. Well, we're saying- You don't have the government. You don't have immunity here. Now look, why shouldn't we, they denied your application without prejudice. Why shouldn't you go back to the district court and prove your point, namely that you're entitled to a preemption because combat or political question prevails here and Kellogg just did what they were told to do. They didn't, they just saluted and said, yes, sir, we'll do whatever we're told to do. And if the facts of that, the district judge will then say that you did what you're told you were to do or a political question or combat activities prevails and I grant you summary judgment. Then you'd have to come up as an appellee. But at this point, why is the record so clear that you should not be required to prove something beyond what you already proved? Because cases like Salih and Taylor say that when your private contractor is acting in a case that arises out of the combatant activities, which the courts have defined as being necessary to and in direct connection with actual hostilities, the record here is replete with facts that the work we were doing out there is in connection with active, with in connection with actual hostilities. You weren't involved in the, in hostile activities here. Like this wasn't a convoy transporting goods or men or anything like that. This was a, uh, you were, you were fixing a pump. You were not involved in any combat activities personally. The military was there in the, in what could be definitely described as a, as a, as a combat area. But your, your services had nothing to do with combat. We were fixing a pump, your honor, on a base in the middle of a battlefield that the district court found was subject to persistent rocket mortar and small arms fire. The reason that soldiers were housed in these hearts, hard stand buildings that did not have grounding and that fact was known to them was because we were in a combat zone where the risk of, uh, of, of harm from the fire was greater than the risk of putting them in the buildings where they had electrical hazards that were documented and known to the military. In that context where we're only asked to go out and fix, when you get a written service order, you go out and you fix what's there and that's it and you leave. We're going into a compound that involves training Iraqi soldiers for combat. Our whole mission was basically integrated with the mission of the military and keeping that base operating. That's what the declarations, the military declaration said. That's what the judge found. Well, why shouldn't you go back to the district court and prove that you're entitled to preemption, uh, and, and, uh, get summary judgment with all the facts that you're going to put forward, uh, not through limited discovery, but through plenary discovery. I don't mean to continually disagree with your honor, but basically you might be right. I'm not, I'm not, I'm making a, I'm making your, your, your argument here. Our point is this is not a preemption case. The Carly Wield coach case that I think, believe you were involved with found this as a issue of government of immunity, extension of the government's immunity or sovereign immunity to us. Yeah, but no one here told you as in other cases, uh, how to do everything and they didn't dictate to you what to do, nor did they do that in Carmichael. The issue, the argument in Carmichael was you can look at the sole negligence of the actor and the courts in the Carmichael court said no. The Taylor court said no. The slay case says no. You can't just isolate the, the, every case can boil down to, did somebody do one thing wrong? You cannot even state tort law doesn't allow you to, Mr. As you are framing your argument, are you claiming that, and obviously the only thing before this court is whether or not you have immunity to the claim that's brought by the plaintiffs. But it seems to me as you are couching your argument, you're basically asking for immunity for your client, for anything that is done under the contract. It's part of this case. No, I, your honor, if we, we don't take that position, I want to make sure I clarified that. The courts, the test for the combatant activities exception, is it necessary to, and in direct connection with actual hostilities. Our view of this case is that the facts of record very clearly established that what we were doing was keeping this base running so that all these military men could go out and fight their mission. And we did what the military told us. We replaced what they told us. They said it was an ungrounded building. Don't, don't ground it. Just, just replace what's there. The example Mr. Kavanaugh gave, I think the courts can easily look at that and say that's not necessarily to, necessary to, and in direct connection with actual hostilities. Leaving tuna fish out in the sun isn't necessary to and in direct connection with actual hostilities. In this case, what we were doing in that building was doing exactly what the military told us. Fixing the problem to keep this base running, get in and out, and don't spend money on inspections, preventative maintenance, or upgrades. But Mr. Kavanaugh pointed out that the complaints about the prior soldier having complained about getting shocked, that you were directed by the military, go correct this problem. They didn't tell you what to do. They told you, go correct this problem. You could have done it for $5 or $2,500, whatever the range was, but you didn't need to go back and get a work order to do it. Do you agree with that? The facts of record show that every, and their witnesses they offered testified that the problem was fixed every time. If you check the record, you won't find any facts that indicate that pump that was involved in this accident was a subject of any of those work orders that he is referring to that relate to shocks. So we, as I said, we have a number of disagreements. So you're making the point perhaps that Judge Cowan and I are getting to, there are facts in dispute here. There are facts in dispute. And it's not clear at this posture of the case as to whether or not the combatant activities exception applies. And why isn't it that you're here too early? Your Honor, I agree with you that there are facts in dispute. As it relates to the specific issue of causation liability. Aren't you here too early for us to decide your immunity defense? Well, that was the next point I was going to make. No, we're not. Because there are enough facts on the record to show that the activities that we were performing were necessary to and in direct connection with actual hostilities. The district court made a number of findings on that fact. The district court also allowed, at least implicitly if not explicitly, that further factual development could change her disposition of the motion, didn't she? She did say that, Your Honor, yes. And she said it, I think, twice. She did say that, Your Honor. One of the differences here, though, is that when you're looking at these issues in the combatant activities and the political question doctrine, the questions all revolve around do we have to question sensitive military judgments? The universe of facts that were before her resulted in her ruling against you. But she allowed for the possibility that further factual development through discovery, since her dismissal was without prejudice, might change the equation. And that was a virtual invitation to you, to conduct further discovery, to raise the issue again, indeed, to raise it at another dispositive motion stage, the summary judgment stage, as opposed to the motion to dismiss stage. We agree, Your Honor. And we did not have any disputes with the district court's factual findings as it related to these motions. We did have disputes with her application of the legal standards. For the combatant activities exception, she imposed upon us a requirement that is not in any of the cases, active military combat operations. That was rejected by Saleh and Taylor, and it's not a requirement of any of those cases. For the PQD, she said that, as Mr. Cavanaugh indicated, he said that she looked at our defenses. But the cases are very clear that you have to analyze whether our defenses raise issues about sensitive military judgments. And she made a number of fact findings that went to that, but she never analyzed the case as it would be tried. Lane v. Halliburton is very clear that the district court must analyze as it would be tried. As it would be tried. She never analyzed that our defenses, she said that we raised that issue, but she did not analyze how our defenses, as they would be tried, questioned those military judgments. And we questioned a number of those judgments. The housing... Maybe she'll have an opportunity to do that again. I think we understand your position. Thank you very much. Thank you to both of the counselors. Very interesting, very compelling case. We'll take it under advisement.     Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.